UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CHEN JIE SHAN,                                           :

                        Plaintiff,                       :        06 Civ. 5095 (PAC)

          - against -                                    :        <u>OPINION & ORDER</u>

CITIBANK, N.A.                                           :

                        Defendant.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Chen Jie Shan ("Chen Shan") brings this action based on a tale told to him by his father's brother (Uncle Chen Tingjin), whose wife's (Lin Guixiang) mother (Madam Kong Yulin) purportedly deposited gold and silver bars with Citibank of Shanghai's predecessor eighty years ago in 1927. Three years later, in 1930, according to the tale which originated with a long deceased relative by marriage, Madam Kong Yulin ("Madam Kong") converted the gold and silver bars into dollars—some $500,000,000. Rather than the customary documents which normally would accompany such a transaction, Madam Kong instead received a steel box with several steel plates inside with the account numbers etched into the box and the amount of deposit on the plates. This box, which Chen Shan supposedly controls, forms the basis for his claim.

Chen Shan's right to claim the $500,000,000 descended to him when Madam Kong willed her rights to her sole surviving child, Lin Guixiang. Lin Guixiang and her husband, Chen Shan's uncle, Chen Tingjin, had no children when Lin Guixiang died intestate. Chen Shan alleges that under the China's law of intestacy, Chen Tingjin took Lin Guixiang's assets as next of kin. In December 1994, Chen Tingjin then gifted and willed the assets to his nephew, the Plaintiff. Other

1

than Chen Shan's saying so, he produces no proof of China's law of intestacy, or the will and gift instruments through which he claims the right to institute this action.

Citibank moves to dismiss, and, alternatively, for summary judgment, on numerous grounds. To support this incredible tale, Chen Shan produces only pictures of an ornate box, reproductions of the certificates, and extracts from a book recounting the history of Citibank in China. There is no evidence that the alleged Citibank accounts exist. Chen Shan's simply saying that they exist does not make it so. Even if he were to produce some evidence, the claims would be time-barred because, according to Chen Shan's own statements, he came into possession of the various financial "instruments" 13 years ago, in 1994. He did not file his lawsuit until 2006, long after the statute of limitations had run. Accordingly, Citibank's motion for summary judgment is granted.

## BACKGROUND

Citibank, an American corporation with its principal place of business in New York, maintains and operates international offices, including Citibank of Shanghai, previously known as Flower Flag Bank of America. (Am. Compl. ¶¶ 4, 13.)[1] During the period of the Chinese Nationalists or the Kuomintang Regime ("KMT") in China,[2] many Chinese citizens deposited their assets into Citibank accounts to safeguard those assets from the KMT's looting. (Am. Compl. ¶ 21.) Chen Shan, a citizen of the People's Republic of China, alleges that Citibank aided and cooperated with the KMT by transferring, concealing, and laundering deposited looted assets, including gold and foreign exchange, while profiting from these deposits. (Am. Compl. ¶¶ 4, 19, 25, 16*.)

---

[1] Following the first 25 paragraphs in the Amended Complaint, the next allegation is paragraph 16 and continues through 41. Therefore, the Court refers to the first 25 paragraphs by their paragraph number, and the second set of paragraphs 16 through 41 by their number and an asterisk.
[2] The Kuomintang Regime was in power in China between 1927 and 1949. (Am. Compl. ¶ 1.)

Chen Shan alleges that in 1927, his father's, sister-in-law's mother, Madam Kong, was in fear of looting by the KMT, and deposited all of her assets, gold and silver bars, with the Flower Flag Bank of America in Shanghai.  (Am. Compl. ¶¶ 4, 23.)  In 1930, Madam Kong allegedly exchanged the gold and silver bars for $500,000,000 United States dollars and transferred the deposits to the head office of Citibank, in New York.  (Am. Compl. ¶ 5.)  Citibank created the accounts and gave Madam Kong a steel box with account numbers etched into it, and several steel plates inside engraved with the amounts of the deposits.  (Am. Compl. ¶¶ 5-7.)  Chen Shan alleges that the box was to act as a bearer bond or certificate of deposit and, to this day, only the owner of the box has access to the accounts.  (Am. Compl. ¶ 16.)

When the KMT withdrew to Taiwan in 1949, Madam Kong's family remained in China, where they lived in hiding for fear of being persecuted by the new Peoples' Republic of China government.  (Am. Compl. ¶ 7.)  Madam Kong died in June of 1984, leaving all of her assets to her daughter, Lin Guixiang, Chen Shan's aunt by marriage.  (Am. Compl. ¶¶ 4, 7.)  Lin Guixiang died intestate in September 1984, survived only by her husband, Chen Tingjin, Chen Shan's uncle. (Am. Compl. ¶¶ 4, 7.)  Chen Tingjin inherited all of his wife's assets, and in December 1994, he left Chen Shan, by will and bequest, the box with the account numbers and deposit plates.  (Am. Compl. ¶¶ 4, 7)  In his initial Complaint, Chen Shan alleges that Uncle Chen Tingjin gave him the box by "will and gift" on or about December 15, 1994.[3]  (Compl. ¶ 4.)  Even before 1994, however, Chen Shan alleges in his initial Complaint that "at all times since the end of World War II," he sought the return of the assets and an accounting.  (Compl. ¶¶ 20, 24.)

---

[3] While Chen Shan makes this assertion in his Amended Complaint, in his Consular Letter he states that his uncle gave him the box and the assets as a gift, on December 15, 1994, along with a signed confirmation gift letter.  (Velella Decl. Ex. C ¶¶ 7, 8.)

When Citibank indicated that it intended to move on the grounds of statute of limitations, Chen Shan amended his Complaint to drop the allegations concerning the post-World War II demands.  In the Amended Complaint, he now alleges that the box was lost for approximately ten years, and was not recovered by his "agents" until April 2005.  (Am. Compl. ¶ 8.)[4]  That month, Chen Shan's counsel contacted Royce Miller, of Citibank, who said that the inquiry regarding the assets should be submitted to the New York Citibank office.[5]  (Am. Compl. ¶ 11.)  Chen Shan alleges that accounts are valued today in excess of $500,000,000 American dollars (Am. Compl. ¶ 18*.)[6]

## PROCEDURAL HISTORY

Chen Shan filed the Complaint on July 5, 2006 and amended the Complaint on October 16, 2006.  He alleges six causes of action: (1) Citibank breached the depository agreements; (2) Citibank has not accounted for the deposited assets; (3) Citibank breached its fiduciary duty to Chen Shan by i) falsely stating that Citibank had conducted searches and found no accounts established by persons who perished prior to 1949, ii) by failing to provide Chen Shan with information regarding deposits and assets or monies deposited in foreign offices, and iii) by conspiring to conceal information regarding Chen Shan's assets and disposing of  the assets without notice; (4) Citibank converted Chen Shan's funds by failing to account for and return those funds; (5) Citibank participated in a conspiracy with the KMT to conceal information about deposits of

---

[4] It is unclear in the Amended Complaint where Chen Shan alleges the accounts and assets at issue to be located, as between Shanghai and New York.  (Am. Compl. ¶¶ 5, 9.)

[5] In an email exchange between Miller and Plaintiff's counsel in May 2005, attached as Exhibit G to Velella's Declaration, Miller actually advises Plaintiff to contact the Head Office of the Bank of China, and not the New York Citibank office. (See  infra. Sect II).

[6] Another discrepancy exists in the amount of assets Chen Shan claims to be in the alleged accounts.  In the Amended Complaint, he asserts that his ancestor established accounts each with assets valued today in excess of $500,000,000 Dollars.  (Am. Compl. ¶ 18*.)  The Five Hundred Million ($500,000,000) Dollar Bank Certificate Chen Shan produced, however, has the dates 1930 and 1933 on it.  (Ruiz Decl. Ex. A.)

looted assets; and (6) Citibank was unjustly enriched by its participation in this conspiracy with the KMT.

On November 21, 2006, Citibank moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or, alternatively, for summary judgment, pursuant to Rule 56, and the motion became ripe for decision on January 19, 2007.

Citibank moves to dismiss and for summary judgment on eight grounds: (1) Chen Shan does not have an account with Citibank; (2) the claims are all time-barred; (3) the claims are barred by laches; (4) Citibank does not owe Chen Shan a fiduciary duty; (5) Chen Shan's claims are barred by the presumption of payment; (6) Chen Shan has no claim because any alleged assets would have escheated; (7) Chen Shan cannot maintain an action for conspiracy; and (8) the claims rest entirely on inadmissible hearsay. The Court grants Defendant's summary judgment motion on the first two grounds, without reaching the remaining grounds.

## DISCUSSION

### I. Summary Judgment Standard

In a motion for summary judgment, the moving party bears the burden of establishing that there are "no genuine issues of material fact" in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004). The moving party may satisfy this burden "by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted). "Viewing the evidence produced in the light most favorable to the nonmovant, if a rational trier

could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992) (citation omitted).

When a motion for summary judgment is supported by sworn affidavits or other documentary evidence permitted by Rule 56, the nonmoving party may not rest "upon the mere allegations or denials of the [nonmoving] party's pleading." Fed. R. Civ. P. 56(e); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the [nonmoving] party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment. Fed. R. Civ. P. 56(e). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted). Similarly, a party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible. See Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

## II. The Alleged Citibank Accounts

Chen Shan's claims are premised on the assertion that he has accounts with Citibank in New York, dating back to 1927 when his father's sister-in-law's mother (that is, his paternal uncle's wife's mother) deposited gold and silver bars later converted into $500,000,000 in bank certificates. Chen Shan's sole support for this remarkable proposition consists of photos—and not very good ones at that—of an ornate steel box into which were etched the alleged account numbers that he claims identify accounts at Citibank. He has also provided a list of account numbers on an

6

Authorization, dated May 4, 1999.[7]  Chen Shan's claim is based on a tale his uncle, Chen Tingjin, told him, which had been told to him by his wife, who learned it from her mother, the aforementioned Madam Kong.  This tall tale of former wealth is completely inadmissible as even Chen Shan, who does not contest the assertion that the whole story is hearsay, seems to concede. Apart from this story, there is not a scintilla of admissible evidence to corroborate his fanciful story that any such accounts ever existed.  Besides the oral family history, all we have are photographs of account numbers, bank notes, and a jewel-encrusted steel box, none of which have any direct or apparent link to Citibank.

In responding to Citibank's motion for summary judgment, Chen Shan has not discharged his burden of demonstrating a genuine issue of material fact.  He has not produced any concrete evidence, such as account balances, or correspondence between himself, or his ancestors, and Citibank regarding these alleged accounts to demonstrate that his ancestors ever created the alleged accounts or that those accounts were transferred to the Citibank New York branch.

Chen Shan's bare conclusions based upon "information and belief that there is an identical box being held by Citibank at their head offices in New York," (Chen Shan Decl. ¶ 3), is completely insufficient and does not come close to creating a factual issue.  Chen Shan's only response is that he has not had a "fully adequate opportunity for discovery" since he has "not been afforded the opportunity to review documents and records in the sole custody, possession and control of the Defendant."  (Pl.'s Mem. in Opp. to  Mot. 10.)   This too is unavailing.  Citibank has affirmed that it conducted searches of the names and account numbers provided by Chen Shan, and

---

[7] The Authorization also vests Dr. Paul L. Taway and James Frederick Garro with the authority to do "whatever . . . is required" with Shan's accounts.  (Velella Decl. Ex. E.)  One's confidence in Chen Shan's allegations is not enhanced by the fact that Garro is a convicted fraudster, money launderer and tax evader.  (Krause Decl. Ex. M.)

that no such accounts, including certificates of deposit, were found on Citibank's books.  (Velella

Reply Decl. ¶ 2.)  Citibank cannot turnover records it does not have.  It is not Citibank's burden to

prove the non-existence of accounts; rather, Chen Shan must provide some shred of plausible

evidence beyond bald conclusory statements that these accounts exist and that Citibank possesses

them because his paternal uncle's, wife's mother said so.  See Celotex Corp., 477 U.S. at 325.

Quite simply, it is not Citibank's burden to debunk a fairytale.

   Besides the complete lack of evidence, there is also a complete lack of plausibility to

Chen Shan's story.  Given the price of gold in 1930—$21 per ounce—it would take 744 tons of

solid gold to yield $500,000,000.  By way of comparison, the largest gold deposit in the world

today is the Federal Reserve Bank in New York City, which contains but 5,000 tons of gold.  Silver

was then priced at $.60 per ounce; it would take 26,000 tons of silver to yield $500,000,000.  Chen

Shan does not specify how much gold and silver were deposited, but simple mathematics suggest

his claim is not credible.  There is nothing in the history of Citibank in China submitted by Chen

Shan which even hints at deposits of gold and silver in such staggering amounts.  Similarly,

$500,000,000 would have made Madam Kong the wealthiest woman in the world in 1930.  Again,

not a whisper of this in the history Chen Shan submits as partial proof for his claim.

   Furthermore, a review of the Complaint and its modification suggests that Chen

Shan will say almost anything, regardless of the truth, to get into and stay in court.  In the initial

Complaint, Chen Shan alleged that he had come into possession of the ornate box with the metal

plates in 1994; and that at all times since the end of World War II, he had sought an accounting

from Citibank.  When Citibank suggested a statute of limitations defense, Chen Shan immediately

amended his Complaint to drop these troubling allegations and substituted instead an allegation that

the box had been misplaced until 2005.  That bit of legal legerdemain, however, does not end his problem with the statute of limitations, as will be discussed.

Moreover, the revised allegations contradict Chen Shan's earlier statements when he was telling a different story.  Chen Shan's Consular Statement dated in 1999 makes clear that he came into possession of the box in 1994.  (Velella Decl. Ex. C.)  This is consistent with the allegations in the initial Complaint.  Further, it is clear that he authorized two agents (including the fraudster) in 1999 to deal with Citibank on his behalf.

Finally, in alleging a conversation between his attorney and a Citibank official, Chen Shan alleges that the official directed Chen Shan "to make the demand on the main Citibank office in New York."  (Am. Compl. ¶ 11.)  The _actual_ language of the email sent to Chen Shan's attorney reads:

> . . . all accounts of Chinese citizens held at Citibank's branches in China, prior to 1949-50 were turned over to the Bank of China . . . .  Accordingly, we suggest that you contact the Head Office of the Bank of China in Beijing.

(Velella Decl. Ex. G.)

Summary judgment standards aside, this pleading does not allege facts sufficient to withstand any kind of motion.  The story is based entirely on inadmissible hearsay; it has too many holes in it; it shifts around; and it is quite simply incredible.  The story must be rejected.

### III. Statute of Limitations

Even if Chen Shan had any evidence that the accounts actually exist, his claims would nonetheless fail as they are all barred by the statute of limitations.

The longest applicable statute of limitations on Shan's claims is six years.[8]  The statute of limitations begins to run when demand for repayment or return of the money is made. N.Y. C.P.L.R. § 206(a)(2).  An inquiry followed by a refusal to pay the deposited money triggers the statute of limitations.  See Tillman v. Guaranty Trust Co., 253 N.Y. 295 (1930) (per curiam); Tran v. Citibank, N.A., 586 F. Supp. 203, 204-05 (S.D.N.Y. 1983).  In the initial Complaint, Chen Shan states that "[a]t all times since the end of World War II" the money was "never accounted for … never returned to plaintiff."  (Compl. ¶ 24.)  The strategic deletion of this admission cannot be overlooked.  If the Court were to do otherwise, it would countenance a procedural slight of hand trick.  Chen Shan's earlier allegations are binding, see Official Comm. of Unsec. Creds. of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003).  They do not evaporate simply because he wants to avoid them.  Chen Shan did nothing when he received the box in 1994. He should have filed his lawsuit then, but did not.[9]

Even if the statute was not triggered in 1994, Chen Shan's claim began to run no later than December 1999.  In the 1999 Consular Statement, Chen Shan reported that Uncle Chen

---

[8] The statute of limitations are: six years for breach of contract, N.Y. C.P.L.R. § 213(2); six years for unjust enrichment, N.Y. C.P.L.R. § 213(1); see Chanler v. Roberts, 275 A.D.2d 625 (1st Dep't 2000) and; three years for conversion, N.Y. C.P.L.R. § 214(4); see Cast The Sleeping Elephant Trust v. Friends World Coll., 210 A.D. 2d 122 (1st Dep't 1994).  As for the conspiracy claim, New York law does not recognize a substantive tort of civil conspiracy.  See Valdan Sportswear v. Montgomery Ward & Co., Inc., 591 F. Supp. 1188, 1191 (S.D.N.Y. 1984).

[9] Furthermore, Chen Shan has not rebutted (or even addressed) Citibank's assertion that demand was not necessary here since the Chinese branch of Citibank's predecessor was forcefully closed in the 1940s during the Communist rule.  See Tran v. Citibank, N.A., 56 F. Supp. at 205 ("[The] contract was broken … when the [foreign] branch ceased to function …. Plaintiff's cause of action accrued at that time. No demand at the [ ] bank was necessary, because in the circumstances it would have been futile.").

10

Tingjin gave him the metal box and the certificates of deposit received by Madam Kong in exchange for the gold and silver bars she deposited with Citibank's predecessors in 1927. In the "Depository Instructions" to Citibank in 1999, Chen Shan directed Citibank to turn over the accounts to "agents," which Citibank did not do. This constitutes a demand triggering the statute of limitations. See Tran, 586 F. Supp. at 204-05. But no action was filed then.

        Chen Shan attempts to avoid the statute of limitations by arguing that the statute should be equitably tolled. The Amended Complaint claims that the box was misplaced until 2005. While that allegation is at variance with other statements by Chen Shan, even if lost, this argument does him no good. New York law requires the plaintiff to have "ownership, possession or control of the money." Aramony v. United Way of America, 949 F. Supp. 1080, 1086 (S.D.N.Y. 1996). Therefore, Chen Shan need not have had actual possession of the box—ownership or control of the accounts would also be sufficient. As he states in his Consular Statement, Chen Shan had possession in 1994. Chen Shan himself also alleges that in 1999, he executed an authorization for his "agents," to "verify my accounts, the account balances, obtain the revised accounts coordinates, if applicable, and whatever else is required to prepare my accounts for entry into a private investment program." (Velella Decl. Ex. E.) Clearly, Chen Shan was exercising control and directing Citibank to pay over the funds to his agents in 1999.

        Chen Shan's second argument for equitable tolling is that Citibank concealed information regarding the accounts, foreclosing him from discovering where they were located. To state a claim for equitable tolling, a plaintiff must plead that he "was induced by fraud, misrepresentations or deception to refrain from filing a timely action" and he "must demonstrate

reasonable reliance on the defendant's misrepresentations."  Zumpano v. Quinn, 6 N.Y.3d 666, 673-74 (2006) (quoting Simcuski v Saeli, 44 N.Y.2d 442, 449 (1978)).

       Even if Chen Shan's allegations that Citibank falsely stated that its searches yielded no matches, and improperly failed to provide information regarding deposits and assets in foreign branches were true, that would not result in equitable tolling.  Nothing in those allegations prevented Chen Shan from bringing the action earlier.  Nor has Chen Shan alleged, other than conclusory statements, that he exercised due diligence in discovering the claims.  See Zumpano, 6 N.Y.3d at 683 ("By due diligence, the Court means that as soon as the plaintiff learns of the misrepresentation, plaintiff must seek to bring an action against defendant.").  Consequently, equitable tolling is not applicable to these claims; they are dismissed as time-barred.

## CONCLUSION

       These decades-old claims are based solely on unsubstantiated oral assertions, personal beliefs, and conclusory statements.  There is no credible evidence whatsoever of the existence of Chen Shan's accounts or of Citibank's affiliation with them.  Moreover, even if true, or if they contained some scintilla of fact, the Court would still grant the motion for summary judgment.  Chen Shan's initial Complaint, his Consular Statement, and his own conduct in directing Citibank to perform various acts indicate that the statute of limitations commenced running, alternatively, post-World War II, or in 1994, or, at the very latest, 1999.  This lawsuit was not commenced until 2006, at least one year after the statute had run.

Citibank's motion for summary judgment is GRANTED.  The Clerk of Court is

ORDERED to close out this case.

Dated: New York, New York
       August 10, 2007

                                        SO ORDERED

                                        PAUL A. CROTTY
                                        United States District Judge

13